**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 18, 2026.**

_____
**MICHAEL M. PARKER**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ALBERTO CIPRIANO MONREAL & | § | |
| LAURA ARIAS MONREAL, | § | CASE NO. 24-50063-MMP |
| | § | |
| DEBTORS. | § | CHAPTER 7 |
| | § | |
| | § | |
| KAPITUS SERVICING, INC., AS SERVICING | § | |
| AGENT FOR KAPITUS, LLC, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | ADVERSARY NO. 24-05013-MMP |
| | § | |
| ALBERTO CIPRIANO MONREAL, | § | |
| INDIVIDUALLY AND DBA BISON PLASTERING, | § | |
| | § | |
| DEFENDANT. | § | |

1

**OPINION**

The Court tried this adversary proceeding on January 21 and 22, 2026. At the start, Plaintiff Kapitus Servicing, Inc. ("**Kapitus**") withdrew several of its claims, including a claim under § 523(a)(2)(B)[1] and claims for fraud, fraudulent transfer, replevin, and unjust enrichment. *See* ECF No. 1. Kapitus prosecuted only four claims: nondischargeability claims under § 523(a)(2)(A), (a)(4), and (a)(6), and a claim for conversion under Virginia law.[2]

The Court grants Kapitus's § 523(a)(2)(A) and Virginia-law conversion claims, as well as Kapitus's § 523(a)(4) claim only with respect to the debt due under the conversion claim, and denies all other relief.

## I.  JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the Western District of Texas dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409. Both Plaintiff and Defendant Alberto Monreal ("**Monreal**") have consented to the entry of final orders and a judgment by this Court in this adversary proceeding. ECF Nos. 15–16. This *Opinion* serves as this Court's findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014.

## II.  BACKGROUND

This dispute arises from an August 17, 2023 forward purchase agreement ("**Agreement**")[3] between Kapitus and Monreal's former business entity, Bison Plastering, Inc. ("**Bison Inc.**").

---

[1]  All statutory references are to Title 11 of the United States Code unless otherwise specified.

[2]  The Agreement is governed under the laws of Virginia. Pl.'s Ex. 2, at 10, § 4.5 ("This Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with Virginia law (to the extent not preempted by federal law) without regard to internal principles of conflict of laws.").

[3]  Pl.'s Ex. 2. Generally, under a forward purchase agreement, parties agree to buy or sell an asset at an agreed price

2

Monreal operated his construction business as both a sole proprietorship and a corporation under basically the same name: Bison Plastering. The Court will refer to Monreal's sole proprietorship as **Bison SP** to distinguish it from Bison Inc.[4] Monreal operated as Bison Inc. at the signing of the Agreement, but subsequently either as Bison SP or Bison Inc. depending upon what was more advantageous for him personally, regardless of legal formalities.

Kapitus and Monreal had a history working together leading up to the Agreement. In total, they inked six similar deals before the Agreement going back to 2017:

1. December 26, 2017 agreement between Kapitus (then operating as Strategic Funding Source, Inc.) and Monreal as Bison SP and guarantor, *see* Pl.'s Ex. 25;

2. March 19, 2019 agreement between Kapitus and Bison Inc. with Monreal as guarantor, *see* Pl.'s Ex. 26;

3. November 4, 2019 agreement between Kapitus and Bison Inc. with Monreal as guarantor, *see* Pl.'s Ex. 27;

4. April 22, 2020 agreement between Kapitus and Bison Inc. with Monreal as guarantor, *see* Pl.'s Ex. 29;

5. October 28, 2020 agreement between Kapitus and Bison Inc. with Monreal as guarantor, *see* Pl.'s Ex. 31; and

6. February 17, 2022 agreement between Kapitus and Bison Inc. with Monreal as guarantor, *see* Pl.'s Ex. 33.

It appears that Kapitus overhauled its agreements between October 2020 and February 2022 such that the February 2022 agreement and the Agreement at issue now are distinctly different in form

---

at a future date or upon a specified future event.

[4] Monreal operated his construction business initially through Bison SP, then through Bison Inc. from its formation in 2018 (*see* Pl.'s Exs. 22–24) until Bison Inc.'s "wind down" and closure in December 2023, then again through Bison SP. The transitions from Bison SP to Bison Inc. in 2018 and back again in 2023 were not clean. When Monreal formed and began operating through Bison Inc., he did not transfer any assets over to the company; rather, he testified that he owned the assets personally and lent them to Bison Inc. at no charge. And when he shuttered Bison Inc. he simply transferred all its money into his own accounts and on behalf of Bison SP demanded and accepted payments from Bison Inc. customers notwithstanding the existence of legal agreements between the customers and Bison Inc.

3

from the previous agreements; despite the overhaul, the relevant contract terms remain substantively the same.

Under the agreements, Kapitus purchased a certain dollar amount of Bison SP or Bison Inc.'s future accounts receivable and, in exchange, Bison SP/Bison Inc. gave Kapitus a percentage of its receipts each month until Kapitus received the dollar amount it purchased. *See* Pl.'s Ex. 25, at 1; Pl.'s Ex. 26, at 1; Pl.'s Ex. 27, at 1; Pl.'s Ex. 29, at 1; Pl.'s Ex. 31, at 1; Pl.'s Ex. 33, at 1. For payment, Bison SP (for the 2017 agreement) or Bison Inc. (for all other agreements) had to maintain a sufficiently funded deposit account from which Kapitus could withdraw a specified amount periodically, and to ensure payment Kapitus took a blanket security interest in all of Bison SP/Bison Inc.'s property and a personal guaranty from Monreal. *See* Pl.'s Ex. 25, at 1, 6–7; Pl.'s Ex. 26, at 1, 7–9; Pl.'s Ex. 27, at 1, 7–9; Pl.'s Ex. 29, at 1, 7–9; Pl.'s Ex. 31, at 1, 7–9; Pl.'s Ex. 33, at 2, 13–15. In the event of a default or a violation of the terms and conditions, the percentage of receivables due Kapitus would increase to 100%. *See* Pl.'s Ex. 25, at 1; Pl.'s Ex. 26, at 1; Pl.'s Ex. 27, at 1; Pl.'s Ex. 29, at 1; Pl.'s Ex. 31, at 1; Pl.'s Ex. 33, at 1.

In the Agreement, Kapitus purchased $192,000 of Bison Inc.'s future accounts receivable for $150,000. *See* Pl.'s Ex. 2, at 1. In exchange, Bison Inc. was required to fund a deposit account with all its receipts (as specifically defined in the Agreement), from which Kapitus would withdraw a base amount of $2,957 weekly up to 4.1% of Bison Inc.'s receipts. *See id.* at 1–2. If Bison Inc. defaulted or otherwise violated the Agreement, Kapitus could withdraw 100% of the amount it was due. *See id.* at 1.

In the Agreement and in a document separately signed on August 17, 2023, as part of the Agreement ("**Representations**"), Monreal and Bison Inc. made several representations, primarily regarding their then-present and expected financial conditions, including:

4

1. The information Monreal provided to Kapitus fairly represented the financial condition of Bison Inc. and Monreal;

2. Neither Bison Inc. nor Monreal expected any material changes to their condition, operation, and ownership;

3. Both Bison Inc. and Monreal would inform Kapitus of any material changes to their condition, operation, and ownership;

4. Neither Bison Inc. nor Monreal were party to any pending litigation that Monreal expected would materially impact the business;

5. Neither Bison Inc. nor Monreal were subject to any tax liens or had any unpaid tax obligations;

6. Monreal did not anticipate that he would close or sell the business within one year;

7. Neither Bison Inc. nor Monreal planned to file for bankruptcy within one year, and both would provide Kapitus with advance notice if they were to file for bankruptcy;

8. Neither Bison Inc. nor Monreal were in arrears on any financial obligations;

9. Neither Bison Inc. nor Monreal would without written consent change the account used for Bison Inc.'s deposits and Kapitus's withdrawals, use any other account for Bison Inc.'s receipts, or divert any of Bison Inc.'s receipts; and

10. Neither Bison Inc. nor Monreal would operate the business under any other name or location without written advance notice.

Pl.'s Ex. 2, at 7–8; Pl.'s Ex. 3, at 1.

In December 2023, four months after entering the Agreement and signing the Representations, Monreal closed Bison Inc., *see* Case No. 24-50063, ECF No. 1 at 75, and the deposit account, *see* Pl.'s Ex. 6, without advance notice to, or written consent from, Kapitus and began to operate his business as Bison SP again—notice and consent that if given would have allowed Kapitus to seek immediate relief or make other arrangements. Monreal testified at trial that, shortly before shuttering Bison Inc., he had reached out to Kapitus to attempt to delay withdrawals; he said that he did not have enough revenue to sufficiently fund the account and he needed some extra time to build revenue. He indicated that he decided to shutter Bison Inc. when

5

Kapitus did not work with him. And he testified that he closed the deposit account because it wasn't sufficiently funded; he wanted to avoid additional charges if Kapitus were to attempt withdrawals without sufficient funds in the account. But Monreal's subsequent deposit of $215,000 of Bison Inc. receivables into the Bison SP accounts shortly after closing the Bison Inc. account suggests that Monreal's asserted reason for transferring the Bison Inc. receivables to the Bison SP accounts was pretextual. Kapitus may well have refused to modify the Agreement, but the facts suggest it wasn't insufficient funding that triggered Monreal to close the Bison Inc. account and route Bison Inc. receivables into the Bison SP accounts.

On January 16, 2024, Monreal filed for bankruptcy without notifying Kapitus. On that day, two of Monreal's personal accounts that he used for Bison SP contained only $253.48 combined. *See* Case No. 24-50063, ECF No. 1 at 14, ¶ 17.3–.4.

Monreal then deposited—between the petition date and the end of January 2024—$215,836.50 into these two accounts. *See* Pl.'s Exs. 42–43. Monreal testified that he requested and accepted money from Bison Inc. customers into Bison SP rather than Bison Inc. for Bison Inc. projects because he allegedly was no longer operating as Bison Inc. When asked at trial whether these January 2024 deposits were "related to work that was done as Bison Plastering," Monreal responded, "Yes." Logistically speaking, Monreal had not resumed operating as Bison SP after shuttering Bison Inc. long enough to have receivables. The Court therefore finds that all of the January 2024 deposits were Bison Inc. receivables.

Kapitus asks the Court to find nondischargeable Monreal's personal guaranty of Bison Inc.'s performance under the Agreement.

III. <u>DISCUSSION</u>

The Court will discuss the conversion claim first, then the nondischargeability claims.

### A. Conversion Under Virginia Law

In Virginia, conversion is "any wrongful exercise or assumption of authority . . . over another's goods, depriving [them] of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 905 (Va. 1994) (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956)). "[A] plaintiff must prove two elements by a preponderance of the evidence: [1] the ownership or right to possession of the property at the time of the conversion and [2] the wrongful exercise of dominion or control by defendant over the plaintiff's property, thus depriving plaintiff of possession." *Kirdassi v. White*, 913 S.E.2d 311, 329 (Va. Ct. App. 2025) (citations omitted). The Virginia Supreme Court notes that, "in many cases, the issue of conversion depends upon whether the defendant or plaintiff has a superior property interest." *Grayson v. Westwood Bldgs.*, 859 S.E.2d 651, 679 (Va. 2021) (citations omitted). "Only a clear, definite, undisputed, and obvious property right in a thing to which the plaintiffs are entitled to immediate possession is sufficient to support a claim for conversion." *Id.* (quoting *Mackey v. MacDannald*, 842 S.E.2d 379, 387 (Va. 2020)).

"The correct measure of damages for conversion is the value of the property converted at the time and place of the conversion." *Quick Serve Concepts, LLC v. Cedar Fair, LP*, 83 Va. Cir. 59, 64 (Cir. Ct. 2011) (citing *Straley v. Fisher*, 10 S.E.2d 551, 553 (Va. 1940)).

Monreal testified that he personally owned much of the equipment and inventory that Bison Inc. used; he never transferred their ownership over to Bison Inc. and instead loaned them to Bison Inc. at no charge. While Monreal's testimony is difficult to believe, Kapitus offered no evidence to show otherwise. The only evidence of converted Bison Inc. assets are the Bison Inc. receivables

that Monreal transferred from Bison Inc. to Bison SP, and that evidence shows that Bison Inc. customers paid Bison SP in attempted satisfaction of Bison Inc. services at Monreal's direction.

Monreal had no individual interest in Bison Inc. receivables or assets. Monreal made large deposits into his personal accounts shortly after filing bankruptcy totaling $215,836.50. For reasons previously enunciated, the Court finds all of these deposits were Bison Inc. receivables. When he shuttered Bison Inc., he was required by law to "apply and distribute its property to discharge, or make adequate provision for the discharge of, all of [Bison Inc.]'s liabilities and obligations." *See* TEX. BUS. ORGS. CODE § 11.053(a).[5] Only after discharging all liabilities and obligations could Bison Inc. distribute anything to Monreal. *See* TEX. BUS. ORGS. CODE § 11.053(c). Bison Inc. did not discharge its liabilities to Kapitus, so Monreal had no right to take any of its assets for himself.

The Agreement gave Kapitus a security interest[6] in virtually all of Bison Inc.'s assets: its receivables, inventory, equipment, intangible property, investments, cash, and other items, to the extent Bison Inc. had any, as well as books and records relating to them. *See* Pl.'s Ex. 2, at 13.

With respect to Bison Inc. receivables that Monreal deposited into his personal bank accounts, Kapitus's interest in them was superior to Monreal's interest. The Court must therefore

---

[5] Bison Inc. was a Texas corporation, so Texas law applies to its wind down.

[6] The Court makes no decision whether the Agreement gives Kapitus ownership over Bison Inc. receivables or merely a security interest. While the Agreement uses language purporting to transfer ownership of all of Bison Inc.'s receivables to Kapitus until the loan is paid off, Kapitus's rights under the Agreement may be no more than that of a secured lender. When interpreting contracts under Virginia law, courts should look at words in the context of the entire agreement. *See* ***Erie Ins. Exch. v. EPC MD 15, LLC***, 822 S.E.2d 351, 355 (Va. 2019). Kapitus, under the Agreement, has no right to exert control over the receivables except to the extent it may withdraw agreed periodic payments; in the event of default, it may pursue its interest in the full amount of the receivables, but only up to the amount it is still owed; and once Kapitus receives the amount it is owed, it loses what few rights it had to control the receivables. Kapitus's rights to the receivables under the Agreement suggest that the Agreement may be merely a loan contract rather than a purchase agreement, and Kapitus a secured lender instead of a purchaser and owner of the receivables. The Court declines to decide this issue because it makes no difference to the results the Court reaches in this *Opinion*. For analysis, therefore, the Court will treat Kapitus as having only a security interest in the receivables because it gives Kapitus the least amount of property interest that reaches the same results.

determine whether Kapitus was entitled to immediate possession of the Bison Inc. receivables at the time Monreal deposited them into his personal bank accounts.

In Virginia, secured transactions fall under the uniform commercial code as codified in the Virginia Code title 8.9A. The relevant provision for the right to possession of collateral after default is § 8.9A-609, which allows a secured party to take possession of collateral after default and without judicial process if it does so without breach of the peace.

Kapitus was entitled to immediate possession of the Bison Inc. receivables because it had a security interest in them and because Bison Inc. defaulted under the agreement.

Kapitus's interest in the Bison Inc. receivables was superior to Monreal's interest at the time Monreal negotiated their satisfaction and deposited the proceeds of them into his personal bank accounts, and Kapitus was entitled to immediate possession of such accounts and their proceeds. Accordingly, the Court grants Kapitus's claim for conversion with respect to those receivables and the proceeds of those receivables.

Conversion damages are the amount converted at the time of the conversion. *Quick Serve Concepts*, 83 Va. Cir. at 64. Monreal converted $215,836.50 of Bison Inc. receivables. Kapitus, however, has only a limited interest in the converted receivables: its interest in Bison Inc. receivables ends after it recoups the amount it is owed under the Agreement. *See* Pl.'s Ex. 2, at 1. Bison Inc. and Monreal owe Kapitus the amount of the purchase amount remaining due under the Agreement, which is $147,645.00 plus contractual interest and fees. *See* Pl.'s Ex. 2, at 1, 8–9; Pl.'s Ex. 6, at 1.

Because Monreal converted $215,836.50 and Kapitus has an interest only up to $147,645.00 of that amount, plus contractual interest and fees, the Court awards Kapitus $147,645.00 plus contractual interest and fees for conversion damages.

9

**B. Section 523(a)(2)(A) Nondischargeability**

A Chapter 7 debtor can receive a discharge of most debts. 11 U.S.C. § 727(a). Section 523, however, excepts from discharge debts Congress has deemed nondischargeable. While § 523 protects certain creditors, it should be strictly construed against the objecting creditor and liberally construed in favor of the debtor. ***Boyle v. Abilene Lumber (In re Boyle)***, 819 F.2d 583, 588 (5th Cir. 1987). Nondischargeability actions are determined by preponderance of the evidence. ***Grogan v. Garner***, 498 U.S. 279, 291 (1991).

When a debtor obtains a debt by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition," the debt is nondischargeable under § 523(a)(2)(A). The nondischargeability elements for debts arising from false pretenses and representations differ from the nondischargeability elements for debts arising from actual fraud.

For nondischargeability of debts arising from false pretenses or representations, the objecting party must show: (1) the debtor knowingly or fraudulently made false representations; (2) describing past or current facts; (3) that were relied on by the other party. ***Allison v. Roberts (In re Allison)***, 960 F.2d 481, 483 (5th Cir. 1992).

For nondischargeability of actual-fraud debts, the objecting party must show (1) the debtor made a representation or engaged in other fraudulent conduct; (2) the debtor knew the representation was false at the time they made it; (3) the debtor made the representation with the intention to deceive the other party; (4) the other party justifiably relied on the representation; and (5) the other party sustained losses as a proximate result of the representation. ***Clem v. Tomlinson (In re Clem)***, 124 F.4th 341, 349 (5th Cir. 2024) (citing ***Saenz v. Gomez***, 899 F.3d 384, 394 (5th Cir. 2018)).

10

Kapitus makes five allegations in its *Complaint* for nondischargeability under § 523(a)(2)(A), each related to the representations Monreal made as part of the Agreement:

1. Monreal misrepresented that Bison Inc. would not close without prior written notice;

2. Monreal misrepresented that Bison Inc. would not sell its assets or equity interests without prior written notice;

3. Monreal misrepresented that Bison Inc. would use the funding under the Agreement for business purposes, not personal;

4. Monreal misrepresented that Bison Inc. would not change the account used for its receipts and Kapitus's withdrawals without written consent and would not remove Kapitus's access to the account; and

5. Monreal misrepresented that Bison Inc. would sufficiently fund the account for Kapitus's withdrawals.

With respect to the second allegation—that Bison Inc. would not sell assets or equity interests—Kapitus did not meet its evidentiary burden to show Bison Inc. did sell assets or equity interests. With respect to equity interests, Bison Inc. did not *sell* equity interests; rather, it simply shut down. With respect to physical assets, Monreal's unrebutted testimony was that he never transferred Bison SP's equipment into Bison Inc. He testified that instead he continued to personally own the equipment and loaned it to Bison Inc. at no charge. His use of the equipment as Bison SP after shuttering Bison Inc. would not have been the result of purchasing the assets. To the extent Monreal rerouted Bison Inc.'s physical assets to himself personally or for use in Bison SP, there is no evidence (other than possession for usage) that Bison Inc. owned those physical assets. With respect to Bison Inc.'s financial assets—the receivables—Monreal converted those assets to his own benefit, but he did not sell them. Monreal did not operate within corporate formalities and did not distinguish between Bison Inc. and Bison SP, except when it favored his individual interests.

11

With respect to the third allegation—that Bison Inc. and Monreal would use the money for business purposes and not personal—Kapitus did not meet its evidentiary burden. This allegation is in reference to the Agreement § 2.13: "[Bison Inc.] is entering into this Agreement for business purposes and not as a consumer for personal, family[,] or household purposes." In context, *personal use* means for a consumer, non-business purpose. Kapitus provided evidence that Monreal converted Bison Inc. receivables and, based on Monreal's RBFCU bank statements, used them to pay many personal expenses. But while Kapitus showed Monreal used the Bison Inc. receivables on the back end for a consumer, non-business purpose, it failed to provide sufficient evidence that Monreal used the Agreement's purchase amount on the front end for a consumer, non-business purpose and failed to provide sufficient evidence that Monreal intended, at the time of the Agreement, to use the purchase amount for consumer, non-business purposes.

Kapitus has satisfied its burden with respect to the first, fourth, and fifth allegations, respectively: Monreal closed Bison Inc. without Kapitus's prior written consent, he changed the account for payment by closing it and removing Kapitus's access to withdraw funds without Kapitus's prior written consent, and he failed to sufficiently fund the Bison Inc. account.

For the Court to find Monreal's debt nondischargeable under § 523(a)(2)(A), Kapitus must show Monreal—at the time he made representations that these events would not occur—either intended to deceive Kapitus or knew his representations were false. *Allison*, 960 F.2d at 483; *Clem*, 124 F.4th at 349.

While evidence exists for and against nondischargeability, the most recent evidence favors it. Monreal closed Bison Inc. down a mere four months after entering the Agreement. More dated evidence shows nearly six years of similar agreements between the parties before the Agreement with no indication *under those agreements* that Monreal wanted to take the money and run. While

Monreal's conduct under prior agreements shows a pattern indicating he acted in good faith under those agreements, it does not explain Monreal's inconsistent behavior under the Agreement—the parties' most recent agreement. Monreal also testified that, shortly before closing Bison Inc. down, he reached out to Kapitus to delay payments so Bison Inc. could raise sufficient revenue to get back on track, but the credibility of this self-serving testimony is overshadowed by the fact that, despite his alleged revenue deficiencies, shortly after closing the Bison Inc. account Monreal deposited $215,836.50 of Bison Inc. receivables into his Bison SP accounts.

The most compelling evidence lies in favor of nondischargeability. A smorgasbord of evidence shows Monreal was playing fast and loose with corporate formalities. Monreal testified that, after setting Bison Inc. up in 2018, he never transferred his business assets—inventory, equipment, etc.—from Bison SP over to Bison Inc. even though he created Bison Inc. to take over the business. This testimony was convenient for Monreal. This allowed him to take advantage of Bison Inc.'s corporate limitations to liability while adding another layer of property protection to assets essential to Bison Inc.'s business. If anyone sued Bison Inc., they arguably couldn't reach any of its business assets other than its bank accounts because Monreal would assert he owned them personally. He wanted to have his cake and eat it, too. While the Court would have loved to have seen Monreal's tax returns to determine if Bison Inc. depreciated—and therefore claimed ownership of—the equipment, no such evidence was ever offered to the Court. Nonetheless, the lack of any sort of rental agreement or exchange of value between Bison Inc. and Bison SP (both of which Monreal controlled) for the business assets reveals the loosey-goosey nature of Monreal's movement of assets to avoid their exposure to creditors. And when he shuttered Bison Inc., he thought he could simply take all its financial assets—including receivables belonging to Bison Inc. and in which Kapitus had some property interest—into his personal accounts, accept money from

13

Bison Inc. customers as if they were Bison SP customers, and continue operating the business through Bison SP.

The proximity in time of Bison Inc.'s closure to the Agreement date combined with the evidence of Monreal's apparent disregard for and taking advantage of corporate formalities is sufficient evidence to show Monreal knew these representations were false when he made them. The Court finds that Monreal knew his representations that he wouldn't close Bison Inc., wouldn't close the Bison Inc. account, and would sufficiently fund the Bison Inc. account were false. He was making no such promises. The Court finds that he made these misrepresentations to deceive Kapitus into entering into the Agreement with him. And the Court finds that Kapitus relied on the misrepresentations when it entered into the Agreement and suffered injuries when the misrepresentations manifested.

The Court grants Plaintiff's claim for nondischargeability under § 523(a)(2)(A).

## C. Section 523(a)(4) Nondischargeability: Fraud or Defalcation

Under § 523(a)(4), debts are nondischargeable when they are the result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Nondischargeability for fraud or defalcation requires a fiduciary relationship. *Bennett v. Bennett (In re Bennett)*, 989 F.2d 779, 784–85 (5th Cir. 1993). Whether a fiduciary exists for § 523(a)(4) analysis is determined by federal law and informed by state law. *Id.* "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *Id.* (citing *In re Angelle*, 610 F.2d 1335, 1339 (5th Cir. 1980)). Put more simply, courts should use state law to determine what rights and duties the potential fiduciary has, then federal law for whether those rights and duties are fiduciary under § 523(a)(4). *Id.* at 785; *see also LSP Invest. v. Bennett (In re Bennett)*, 970

14

F.2d 138, 143 (5th Cir. 1992) (elaborating that, when courts look to state law, they should look beyond whether there is a formal trust agreement under state law and instead focus on what trust-type obligations are imposed), *withdrawn and substituted*, **Bennett v. Bennett**, 989 F.2d 779.[7]

Fiduciary relationships under § 523(a)(4) are construed narrowly. They apply only to technical trusts, and the fiduciary relationship must arise independent of any contractual obligation. **Tran**, 151 F.3d at 343–46. They also must pre-exist the wrongful conduct, *see* **Gupta v. E. Idaho Tumor Inst.**, 394 F.3d 347, 350 (5th Cir. 2004) ("[A] trust must exist 'prior to the wrong and without reference to it' in order to constitute a 'technical trust' within [§ 523(a)(4)]." (quoting *Angelle*, 610 F.2d at 1340)), so any argument with respect to the "zone of insolvency" does not apply. The zone-of-insolvency fiduciary relationship is "remote from the conventional trust or fiduciary setting, in which someone . . . in whom confidence is reposed is entrusted with another person's money for safekeeping." **Follett Higher Educ. Grp. v. Berman (In re Berman)**, 629 F.3d 761, 767 (7th Cir. 2011).

There is no fiduciary relationship here. Despite clever drafting, the Agreement suggests a contractual creditor–debtor relationship rather than a fiduciary one. As this Court noted in a recent case also involving Kapitus, Kapitus and the borrower (here, Bison Inc.) were simply parties to a contract and, while the contract imposed obligations on the borrower with respect to repayment of a debt, none of those obligations could be construed as fiduciary in nature. **Kapitus Servicing Inc.**

---

[7] While it is sometimes necessary for courts to look to a state statute for the creation of a formal trust, it is not the creation of the formal trust that matters but rather whether the statute, as it applies to the particular relationship at issue, creates the kind of obligations that, under federal law, constitute a fiduciary relationship under § 523(a)(4). *See* **Tex. Lottery Comm'n v. Tran (In re Tran)**, 151 F.3d 339, 342–43 (5th Cir. 1998) ("Statutory trusts . . . can satisfy the dictates of § 523(a)(4). It is not enough, however, that a statute purports to create a trust . . . . The question whether a state statute creates the type of fiduciary relationship required under § 523(a)(4) is one of federal law. To make this determination[,] a federal court must nevertheless look to state law—here, to the statute purporting to create a fiduciary relationship and to any regulations promulgated in regard thereto—to discern whether the supposed fiduciary relationship possesses the attributes required under § 523(a)(4) . . . .").

*v. Keith (In re Keith)*, No. 22-06003, 2023 Bankr. LEXIS 2662 (Bankr. W.D. Tex. Oct. 30, 2023) (quoting *Strategic Funding Source, Inc. v. Dodge (In re Dodge)*, 623 B.R. 663, 668 (N.D. Ga. 2020)). Neither the Agreement nor the guaranty create any fiduciary duties.

Because no fiduciary relationship exists here, the Court denies Kapitus's claims under § 523(a)(4) with respect to fraud and defalcation.

### D. Section 523(a)(4) Nondischargeability: Embezzlement and Larceny

The difference between larceny and embezzlement in § 523(a)(4) analysis is whether the debtor initially had lawful possession of the property. *See Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998). Monreal's alleged appropriation of Bison Inc. receivable proceeds may constitute embezzlement but not larceny because Monreal initially had lawful possession of the property.

Embezzlement under § 523(a)(4) is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Savage v. Port Louis Owners Ass'n (In re Savage)*, 333 Fed. App'x 831, 835 (5th Cir. 2009) (citing *Miller*, 156 F.3d at 602). A creditor proves embezzlement by showing three elements:

1. Either that it entrusted its property to the debtor or that the debtor otherwise lawfully obtained the property,

2. The debtor appropriated the property for a use other than that for which it has possession, and

3. The circumstances indicate fraud.

*Powers v. Caremark, Inc. (In re Powers)*, 261 Fed. App'x 719, 723 (5th Cir. 2008) (per curiam); *Miller*, 156 F.3d at 603 (quoting *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1773 (6th Cir. 1996)).

16

Fraud, in the context of embezzlement, is an intent to "deceive another person[] and to induce such other person, in reliance upon the deception[,] to assume, create, transfer, alter[,] or terminate a right or obligation with reference to property." *In re Harrell*, 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988); *see also* *PACCAR Fin. Corp. v. Dhaliwal (In re Dhaliwal)*, 630 B.R. 24, 31 (Bankr. S.D. Tex. 2021) (a recent case using a nearly identical quote and citing a string of cases back to *In re Harrell*). "Fraudulent intent may be inferred from the conduct of the [d]ebtor and from [the] circumstances of the situation" or "negated by the fact that the [d]ebtor applied the funds openly, without any attempt at concealment." *In re Harrell*, 94 B.R. at 91.

Courts have used four non-exhaustive factors when considering circumstantial evidence for fraudulent intent under § 523(a)(4):

1.  Whether the debtor alone had access to the creditor's money;

2.  Whether the debtor had knowledge that the creditor wanted his money returned;

3.  Whether the debtor had accounted to the creditor for the funds; and

4.  Whether an accounting had been made for the funds.

*In re Bridges*, No. 19-44181-elm, 2025 Bankr. LEXIS 2682, at *17 (Bankr. N.D. Tex. Oct. 17, 2025) (citing *Williams v. Laughlin (In re Laughlin)*, No. 09-35842-H4-07, 2012 WL 1014754, at *13 (Bankr. S.D. Tex. Mar. 23, 2012)).

**Only the debt arising from conversion falls under embezzlement.**

Embezzlement, if it exists in this case, must be through Monreal's appropriation of Bison Inc. receivables for the benefit of Bison SP operations because it was the only alleged misappropriation discussed at trial.

Any allegation that Monreal appropriated Kapitus's loan to Bison Inc. is incorrect because the loan was neither entrusted to nor appropriated by Monreal. Kapitus loaned money to Bison

17

Inc., not Monreal individually. And the money Monreal appropriated for use in Bison SP was made of receivables he appropriated from Bison Inc. While the receivables were likely the product, at least in part, of Bison Inc. spending the Kapitus loan on operations, the receivables were not themselves the loan. Even if the Court assumes the Agreement was a purchase agreement and not a loan contract, the purchase amount was no longer Kapitus property once the purchase was made.

Moreover, because any embezzlement must be through Monreal's appropriation of Bison Inc. receivables toward Bison SP operations, it applies only for the debt arising under Kapitus's conversion claim and no other debts. Section 523(a)(4) states, in relevant part, that a discharge in the bankruptcy case "does not discharge an individual debtor from any debt *for* . . . embezzlement." 11 U.S.C. § 523(a)(4) (emphasis added). The non-conversion debts in this case are not *for* embezzlement; rather, they arise from Bison Inc.'s failure to pay Kapitus and other breaches of the Agreement, as well as misrepresentations made when entering the Agreement. Monreal's appropriation of Bison Inc. receivables did not create the pre-existing non-conversion debts owed Kapitus. The non-conversion debts owed Kapitus are not themselves "for embezzlement," as required under § 523(a)(4).

**Kapitus has sufficient property interest to bring an embezzlement claim.**

The Court must determine, then, whether a creditor—here, Kapitus—can support an embezzlement claim with a debt that arose through the appropriation of assets that both it and the debtor did not own.[8] If so, the conversion claim in this case could be "for embezzlement" because

---

8    As discussed *supra* at note 6, the Court treats the Agreement as a loan contract rather than a purchase agreement, and therefore Kapitus as having a security interest in, and not ownership of, the converted Bison Inc. receivables. If instead Kapitus has ownership of the Bison Inc. receivables, then the result here remains the same.

18

Kapitus's conversion claim arose from Monreal's appropriation of the Bison Inc. receivables—property Kapitus had a security interest in but did not own.[9]

At first blush, the answer appears to be, "no." Most courts hold that a security interest is insufficient to trigger embezzlement liability, and the creditor must show it *owns* the allegedly embezzled property. *See, e.g.*, **Kraus Anderson Cap., Inc. v. Bradley (In re Bradley)**, 507 B.R. 192, 200 (B.A.P. 6th Cir. 2014) (collecting cases). But the majority of these cases dealt with a secured creditor who brought a claim against a debtor who owned the collateral—the property was often a debtor's financed vehicle or home.[10] The rest of the cases dealt with a creditor with no property interest at all.[11] Diving deeper into these cases, the majority's analysis underlying this holding turns more on the debtor's ownership than the creditor's lack of ownership—like the Sixth Circuit Bankruptcy Appellate Panel concluded: "This Panel agrees with this line of cases. 'As owner of the collateral, the debtor remained the owner of its proceeds, even though both the collateral and its proceeds were subject to a security interest. No person can embezzle from himself.'" **Kraus Anderson Cap.**, 507 B.R. at 200 (quoting **Deere & Co. v. Contella (In re Contella)**, 166 B.R. 26, 30 (Bankr. W.D.N.Y. 1994)).

No other case, as far as the Court can tell, addresses what happens when the creditor has a security interest in the property and the debtor has no interest at all. And so none had the

---

[9] Virginia law allows Kapitus to pursue a conversion claim over assets it did not own because Kapitus held a superior interest (a security lien) in the Bison Inc. receivables than did Monreal individually (no interest) and it had a right to immediate possession of them.

[10] *See, e.g.*, **Kraus Anderson Cap.**, 507 B.R. at 200; **Pace Fin., LLC v. Herring (In re Herring)**, No. 20-00094, 2022 Bankr. LEXIS 1709, at *12 (Bankr. W.D. Tenn. June 14, 2022); **BMO Harris Bank v. Richert (In re Richert)**, 632 B.R. 877, 893 (M.D. Fla. 2021); **Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)**, 404 B.R. 244, 273–74 (Bankr. E.D. Mich. 2009); **Bank of Castille v. Kjoller (In re Kjoller)**, 395 B.R. 845, 851 (Bankr. W.D.N.Y. 2008); **Banco Popular v. Rodriguez (In re Rodriguez)**, No. 06-31471, 2007 Bankr. LEXIS 547, at *16 (Bankr. S.D. Tex. 2007); **Bank Calumet v. Whiters (In re Whiters)**, 337 B.R. 326, 333 (Bankr. N.D. Ind. 2006); **Bombardier Cap., Inc. v. Tinkler (In re Tinkler)**, 311 B.R. 869, 876 (Bankr. D. Colo. 2004); **In re Ayers**, 25 B.R. 762, 774–75 (Bankr. M.D. Tenn. 1982).

[11] *See, e.g.*, **Hulsing Hotels Tenn. v. Steffner (In re Steffner)**, 479 B.R. 746, 766 (E.D. Tenn. 2012); **Mut. Mgmt. Servs. v. Fairgrieves (In re Fairgrieves)**, 426 B.R. 748, 756 (N.D. Ill. 2010).

opportunity to address what happens when the creditor has property interest in the appropriated property sufficient to support a conversion claim but not outright ownership.

Embezzlement at its core is conversion, just with added elements. *See **Bullock v. BankChampaign***, 569 U.S. 267, 275 (2013) (noting that the defining feature of embezzlement under § 523(a)(4) is conversion). The elements of embezzlement that distinguish it from plain conversion address only a debtor's actions and state of mind: first, how the debtor came into possession; second, how the debtor used the property; and third, what the debtor intended. None of these elements place any additional requirements on the creditor's ownership of the property; they don't address the creditor at all. The Court cannot find a good reason why a creditor's ability—i.e., the sufficiency of its property interest in the property—to bring a § 523(a)(4) embezzlement claim should be any different from its ability to bring a conversion claim.

This is consistent with the majority courts' analysis, *see generally supra* note 10, that secured creditors cannot bring embezzlement claims against debtor owners. In those cases, the debtors owned the collateral at issue, so they could not embezzle their own property. And the creditors, with merely a security interest in the property, had a lesser property interest than the debtor owners. A security interest is insufficient against the owner of the property.

The Court agrees with the majority courts' analysis but will refine and refocus the rule: a creditor must have sufficient property interest in the allegedly embezzled property such that the creditor could bring a conversion claim.

Determining whether a creditor has sufficient property interest requires looking to state law.[12] Section 523(a)(4) already does this with its fraud-or-defalcation element. *See supra* § III(C);

---

[12] *See **Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement***, 962 F.2d 1192, 1198 (6th Cir. 1992) ("[P]roperty rights have traditionally been, and to a large degree are still, defined in substantial part by state law.").

see generally *NextGear Capital, Inc. v. Garcia (In re Garcia)*, _ B.R. _, No. 25-03017, 2026 WL 899306, at \*5–13. (Bankr. W.D. Tex. Apr. 1, 2026). Courts should use state law to determine what rights and duties exist, then federal law for what effect those rights and duties have under § 523(a)(4). *See **Bennett v. Bennett***, 989 F.2d at 785. For fraud or defalcation, a court looks to state law for the creation and existence of the rights and duties of the potential fiduciary; it then uses federal law to determine whether those rights and duties actually make a fiduciary. ***Id.***

This analysis applies equally to whether a creditor plaintiff has sufficient property interest to bring an embezzlement claim under § 523(a)(4). State law dictates whether the creditor has sufficient property interest to support a conversion claim, and federal law determines whether the elements of embezzlement are met.

Here, Virginia law applies, and Kapitus has a valid claim under Virginia Law for conversion. It therefore has sufficient property interest in the allegedly embezzled property to bring a § 523(a)(4) embezzlement claim against Monreal.

**The debt arising from conversion is § 523(a)(4) embezzlement and is nondischargeable.**

The three elements of an embezzlement claim are met here.

The first element—that the creditor entrusted its property to the debtor or the debtor otherwise lawfully obtained the property—is met. Monreal lawfully obtained the Bison Inc. receivables because, as sole owner of Bison Inc., he had possession and control over its assets.

The second element—that the debtor appropriated the property for a use other than that for which it has possession—is met. Monreal appropriated the Bison Inc. receivables toward his business in Bison SP. As discussed *supra*, Bison Inc. had outstanding debt to Kapitus when it shut down, so Monreal had no right under Texas law to take assets out of Bison Inc.

The third element—that the circumstances indicate fraud—is met. Monreal closed the required deposit account and moved the funds to his personal bank accounts, giving him sole access to the Bison Inc. receivables. He stated that he closed the account because it wasn't sufficiently funded and, when he continued to receive payments from Bison Inc. customers—$215,836.50—he refused to reopen the account, pay Kapitus (even though he knew Kapitus wanted payment), or inform Kapitus in any way what he was doing with the receivables. Rather than work with Kapitus to resolve the issues, Monreal cut off all communication with Kapitus and appropriated the receivables to his personal business. This circumstantial evidence shows Monreal intended to deceive Kapitus and permanently deprive it of the receivables that were collectable by Kapitus.

The Court therefore finds the debt arising from Kapitus's conversion claim nondischargeable under § 523(a)(4). The Court grants Kapitus's claims under § 523(a)(4) with respect to the conversion debt and denies Kapitus's claim under § 523(a)(4) with respect to any debts other than those arising under Kapitus's conversion claim.

### E. Section 523(a)(6) Nondischargeability

Under § 523(a)(6), debts are nondischargeable when they result from "willful and malicious injury . . . to another entity or to the property of another entity." This requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." ***Kawaauhau v. Geiger***, 523 U.S. 57, 61 (1998) (emphasis in original). Nondischargeability requires an actor to "intend the consequences of an act, not simply the act itself," mirroring the definition of an intentional tort. ***Id.*** at 61–62 (internal quotation marks omitted). Simple breaches of contract, even if intentional, do not cause injuries that may be excepted from discharge unless

accompanied by willful and malicious tortious conduct. *Id.* at 62; *Williams v. Int'l Bhd. of Elec. Workers Loc. 520*, 337 F.3d 504, 509 (5th Cir. 2003).

Kapitus has not provided sufficient evidence to show Monreal intended to injure Kapitus. Monreal deceived and made misrepresentations to induce Kapitus into favorable terms under the Agreement. It is also apparent that he closed his business and moved assets to keep Kapitus from collecting its debt. But his intention to obtain and keep the Bison Inc. receivables for his own benefit does not prove that he intended injury to Kapitus. There is not sufficient evidence to suggest he had any independent intention to injure Kapitus.

Because Kapitus failed to provide sufficient evidence that Monreal intended to injure Kapitus, the Court denies Kapitus's claims under § 523(a)(6).

## IV. CONCLUSION

The Court will separately enter a judgment granting Kapitus's conversion claim under Virginia law, nondischargeability claim under § 523(a)(2)(A), and nondischargeability claim (for conversion damages only) under § 523(a)(4) and denying all other relief, as well as an award to Kapitus for $147,645.00 in damages plus contractual interest and fees.

Normally, the Court would enter a judgment contemporaneously with this *Opinion* declaring the amount of the nondischargeable debt held by Kapitus, but in this case further proceedings are necessary to determine attorney's fees and accrued interest due to Kapitus. So, the Court directs the parties to attempt to reach an agreement within twenty-one days of this *Opinion* on the amount of attorney's fees and interest that will also be declared nondischargeable. If the parties cannot come to an agreement, the Court instructs Kapitus to file a motion seeking a hearing to determine the amount, if any, of attorney's fees and interest due to Kapitus related to the Court's *Opinion*.

# # #